[No. 13894.  *En Banc.*  July 17, 1917.]

N. H. ST. GERMAIN *et al., Appellants,* v. BAKERY & CONFECTIONERY WORKERS' UNION No. 9 OF SEATTLE *et al., Respondents.*[1]

INJUNCTION—TRADE UNIONS—PICKETING—RIGHT TO PICKET. Where plaintiffs' restaurant was picketed by labor unions, the pickets wearing cards which declared the place unfair to union labor, and the business and prospective purchasers were interfered with, and the only object of the picketing was to intimidate, not only the public, but the plaintiffs and force them to enter into a contract, the same will be enjoined as an unlawful interference with plaintiffs' business, regardless of whether it was peaceful or otherwise.

DAMAGES—FROM PICKETING—LOSS OF PROFITS—EVIDENCE—SUFFICIENCY. Upon enjoining the picketing of plaintiffs' restaurant, substantial damages cannot be awarded merely on a showing that there was a large falling off of their business, where there was nothing to show what the profits were; and it is not enough to show that the average gross receipts had been $4,000 monthly and that they fell off to $1,000 monthly.

[1]Reported in 166 Pac. 665.

TRADE UNIONS — ACTIONS — PARTIES — JUDGMENT.  In an action against unions and their officers for "picketing" plaintiffs' place of business, in which the complaint alleges that the unions were voluntary organizations with a membership of over five hundred, and that it was impracticable to bring in all the members, judgment for plaintiffs should award injunction, damages, and costs against the unions as organizations as well as against all other persons acting by, through, or for them.

HOLCOMB, J., dissents.

Appeal from a judgment of the superior court for King county, Tallman, J., entered June 30, 1916, favorable to the defendants, in an action for an injunction, after a trial on the merits before the court. Reversed.

*Halverstadt & Clarke* and *Piles & Halverstadt*, for appellants.

*Thomas Byron MacMahon* and *Preston & Thorgrimson*, for respondents.

MOUNT, J.—This action was brought to enjoin the defendants from picketing in front of the plaintiffs' places of business in the city of Seattle, and from annoying and harassing the plaintiffs' customers as they were entering or leaving the plaintiffs' places of business, and for damages.

The case was tried to the court. No findings of fact were made, but the court, at the conclusion of the trial, entered a decree as follows:

"It is Ordered, Adjudged and Decreed, That Percy Wood, William T. McGuerin, T. H. Bolton, and Guida Axtheim, individually and as associates under the name and style of Bakery & Confectionery Workers' International Union No. 9 of Seattle, Washington, and all persons associated with said individuals as said Bakery & Confectionery Workers' International Union No. — of Seattle, Washington, and Harry Mitchell, Frank Guilke, and William H. Fraser, individually, and associated together under the name and style of Cooks' and Assistants' Union, Local No. 33, and all persons associated with them under such name, and Edward Schutt, and their and each of their agents, and employees,

be and they hereby are, enjoined and restrained from congregating in front of plaintiffs' place of business at No. 409, Pike Street and No. 1515-1517, Pike Place, each, in the city of Seattle, King county, Washington, from talking to any one while in front of either of plaintiffs' said places of business in any way reflecting on plaintiffs' business or on the manner of conducting the same, from saying anything while in front of either of plaintiffs' said places of business concerning plaintiffs' employing members of the Japanese race or Chinamen, from stating that plaintiffs' business is conducted in a dirty manner, from the use of the word 'scab' or 'scabs' while in front of plaintiffs' places of business, from laying hands upon or touching any one while in front of either of plaintiffs' said places of business with intent to in any way cause such person not to trade with, or enter the said stores of plaintiffs.   But such injunction shall not run against said Unions as entities.

"It is Further Ordered, Adjudged and Decreed, That said defendants may, if they desire, place and maintain two pickets in front of each of plaintiffs' said places of business, and that said pickets may wear a badge or scarf having on the same the words, 'St. Germain's Bakeries and Restaurants Unfair to Organized Labor,' or words to that effect, but nothing more.   That said pickets at plaintiffs' store No. 409, Pike Street shall walk on the outer curb of the sidewalk, and at plaintiffs' place of business at No. 1515-1517 Pike Place shall walk in the center of the sidewalk, and if the crowds in front of plaintiffs' said places of business are such at any time that said pickets cannot walk in the middle of the sidewalk, they shall cease picketing until conditions are such that they can walk in the middle of the sidewalk.

"It is Further Ordered, Adjudged and Decreed, That said defendants may use cards such as Plaintiffs' Exhibit 'A' introduced in evidence in this cause, but they are perpetually enjoined and restrained from throwing or leaving any of them in plaintiffs' said places of business.

"It is Further Ordered, Adjudged and Decreed, That plaintiffs do have and recover their costs and disbursements herein to be taxed of and from Percy Wood, William T. McGuerin, and Guida Axtheim, individually, and of each of them, and of Harry Mitchell, Frank Guilke and William H. Fraser, individually, and of each of them, and of Edward Schutt."

The cards referred to in this decree were cards about three inches square, and contained the words, "St. Germain Bakeries, Public Market and 409 Pike St., Unfair to Organized Labor." The plaintiffs have appealed from all that part of the decree beginning with, and following, the words, in the first paragraph, "But such injunction shall not run against said Unions as entities."

There is no material dispute in the facts, which are, in substance, as follows:

The respondent unions are voluntary associations of bakers and cooks, respectively. The respondents Wood and Mc-Guerin are president and business agent, respectively, of the respondent bakers' union, and members of it. Respondents Bolton and Axtheim are members of that union. The respondents Mitchell, Guilke and Fraser are president, business agent, and secretary, respectively, of the cooks' union. The respondent Schutt does not belong to either union, but was paid for his participation in picketing the appellants' places of business. The appellants have been engaged in the bakery and dairy-lunch business in Seattle for about sixteen years. They had two stores in the city of Seattle, one at No. 409 Pike Street, and the other in the Pike Place market. The store in the Pike Place market fronts on one of the most crowded streets in the city of Seattle. The appellants, prior to April 29, 1916, employed only union bakers. They were then employing a cook by the name of Paulsen, who was a member of the cooks' union, but was delinquent in his dues. In the early part of April, 1916, Mr. McGuerin and Mr. Guilke, representing their respective unions, called upon the appellants and demanded that they employ only union men, and stated that, if the appellants did not discharge Mr. Paulsen, the union bakers in their stores would be called out. The appellants refused to comply with this request, the union bakers and cooks left the employment of the appellants, and thereupon pickets were stationed in front of both stores of the appellants. These pickets wore white coats, with the

words, "St. Germain's Bakery Employs Non-Union Labor,"
on the front, and, on the back of these coats appeared the
words, in black letters, "Low Wages, Long Hours, Seven
Days Per Week."

These pickets went on duty about 11:30 o'clock in the
morning, and continued until the stores were closed in the
evening.    At the beginning, the pickets marched back and
forth directly in front of the doors of the places of business
of the appellants.    There was evidence to the effect that they
jostled customers entering and leaving the stores.    Upon
Saturday, May the 6th, pickets to the number of forty or
fifty congregated in front of the Pike Place store, and, while
the street was badly crowded, packed the recesses in which
the doors were set, and prevented customers from entering
the store.    Upon several occasions, cards about three inches
square, with the words, "St. Germain Bakeries Unfair to Or-
ganized Labor," were scattered upon the street and in the
store.    Prospective purchasers, desiring to enter the store,
were called "scabs."    Prospective purchasers, entering and
leaving the store, jostled certain of the picketers.    Policemen
were called upon two different occasions to prevent trouble.
One arrest was made, but the person arrested was not prose-
cuted.

It is insisted by counsel for the respondents that, upon
the trial of the case, the rightfulness, wrongfulness, or un-
lawfulness of the strike was not entered into, and it is also
insisted that the case was tried upon the assumption that the
respondents were justified in calling the strike, and that the
only question presented to the lower court, and the only one
which should be presented here is whether the acts of the
respondents, following the strike, and while they were in such
combination, were such as to entitle the appellants to equi-
table relief.

We shall assume, for the purpose of this case, that the
respondents were justified in calling the strike.    The reason
for the strike is material only as tending to show the animus

of the respondents in picketing the places of business of the appellants.

The question, then, for decision is, as stated by counsel for the respondents: Were the acts of the respondents, in picketing the places of business of the appellants, justified in law, and are the appellants remediless to restrain picketing by the respondents in the manner provided for by the part of the decree appealed from, or for any purpose?

The decisions upon this question are not altogether in harmony. The rule is generally stated, 24 Cyc., page 834, as follows:

"While it has been held that the mere stationing persons near the premises of another for the mere purpose of observing and obtaining information, for the purpose of conveying information to persons seeking or willing to receive the same, or for the purpose of using orderly and peaceful persuasion with those willing to listen, does not in itself constitute intimidation if done in a peaceful manner, the rule has been repeatedly laid down that the keeping of patrols in front of or about the premises of the employer, accompanied by violence or any manner of coercion to prevent others from entering into or remaining in his service, will be enjoined. . . .

"The doctrine that there may be a moral intimidation which is illegal announced by the supreme court of Massachusetts was among the first judicial steps taken in this country toward overturning the rule permitting peaceable picketing laid down in the first clause of this paragraph, and was a forerunner of the later rule that there can be no such thing as peaceful picketing, and consequently that all picketing is illegal. Picketing will be enjoined as a continuing injury to business notwithstanding it may be punishable as a crime, and the right to injunction against it has been based upon the ground that the aggrieved person is entitled to protection of his 'probable expectancy' which is defined as the right to enjoy a free and natural condition of the labor market.

. . .

"It has been repeatedly held that boycotts, in the sense of organized attempts to coerce a person or party into compliance with some demand, by combining to abstain, or compel others (against their will) to abstain, from having any busi-

ness relations with him, are unlawful and will be enjoined; to justify the granting of an injunction, it is not necessary that actual violence shall have been used by defendants; it is sufficient that the means used are threatening and intended to overcome the will of others, and prevent customers from dealing with and laborers from working for the complainant. Intimidation, coercion, or threats of injury to person or property are, however, necessary to justify an injunction against a boycott. And it is necessary that the complainant shall have some established business which may be injured in order to enable him to maintain the bill."

This seems to sum up, generally, the condition of the law upon the subject of picketing, and the rule there stated is supported by numerous authorities cited in the foot notes. In the note to *Underhill v. Murphy*, a Kentucky case, reported in 4 Ann. Cas., page 784, the annotator says:

"A court of equity has jurisdiction to enjoin picketing, intimidation of employees, and acts of violence, where they are likely to cause irreparable injury to the employer's business and property, though the acts sought to be restrained are punishable as criminal offenses. [Citing a number of cases.] One of the leading cases on the general subject of the jurisdiction of equity to restrain by injunction unlawful interference with business and property rights by strikers, notwithstanding the fact that the acts restrained are punishable as criminal offenses, is that of *In re Debs*, 158 U. S. 564."

But, whatever the rule may be elsewhere, this court, in the case of *Jensen v. Cooks' & Waiters' Union*, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302, where this exact question was under consideration, said:

"The vital question at issue, however, it seems to us, is a simple one and easy of solution. Clearly, the acts of the appellants and defendants, as set forth in the complaint, are illegal and may be restrained by an injunction. It is true that a man, not under contract obligations to the contrary, has the right to quit the service of another at any time he sees fit, and may lawfully state, either publicly or privately,

the grievances felt by him which gave rise to his conduct. And that right which one man may exercise singly, many may lawfully agree, by voluntary association, to exercise jointly. But one man singly, nor any number of men jointly, having no legitimate interests to protect, may not ruin the business of another by maliciously inducing his patrons and other persons not to deal with him. Men cannot lawfully jointly congregate about the entrance of one's place of business, and there, either by persuasion, coercion, or force, prevent his patrons and the public at large from entering his place of business or dealing with him. To destroy his business in this manner is just as reprehensible as it is to physically destroy his property. Either is a violation of a natural right, the right to own, and peaceably enjoy, property."

The respondents seek to distinguish that case from the one at bar by reason of the fact that, in that case, there was a demurrer to the complaint and the facts were admitted, while in the case at bar the facts were disputed and the case was tried out upon the merits. We think there is no merit in this distinction. Here, the case was tried upon the merits, but the facts, as shown by the record, are clear to the effect that the grievance of the respondents was that St. Germain's bakeries and stores were unfair to organized labor. The respondents, for that reason, maintained pickets on the sidewalk in front of the appellants' places of business. The only object of maintaining these pickets was to intimidate these appellants and their patrons. There could have been no other object, because the union laborers had been called out. They were not working there, and in order to require these appellants to employ union labor, the respondents sought to, and did, intimidate the public from entering the stores and dealing with the appellants. Whether these facts were alleged in a complaint which was undenied, or were proven upon a trial, makes no difference. Whether the picketing was peaceable or otherwise, under the facts in this case, is entirely immaterial, because the sole object of the respondents was to intimidate, not only the public, but also these appel-

lants, and force them to enter into a contract which they were unwilling to enter into.

The books are full of cases to the effect that:

"The right to carry on a lawful business without obstruction is a property right, and its protection is a proper object for the granting of an injunction." *Nashville, C. & St. L. Ry. Co. v. McConnell*, 82 Fed. 65 (syllabus).

See, also, *Barr v. Essex Trades Council*, 53 N. J. Eq. 101, 30 Atl. 881; *Purvis v. Local No. 500 United Brotherhood of Carpenters and Joiners*, 214 Pa. St. 348, 63 Atl. 585, 112 Am. St. 757, 12 L. R. A. (N. S.) 642.

In *Commercial Bindery & Printing Co. v. Tacoma Typographical Union No. 170*, 85 Wash. 234, 147 Pac. 1143, this court said:

"To destroy a business is not different from the destruction of physical property. If employees may be intimidated while in their employment, the business of the employer may be destroyed. It is as much the duty of the court to restrain conduct which will have the effect of destroying the business as it is to prevent the destruction of physical property."

See, also, *Jones v. Leslie*, 61 Wash. 107, 112 Pac. 81, Ann. Cas. 1912B 1158, 48 L. R. A. (N. S.) 893; *Huntworth v. Tanner*, 87 Wash. 670, 152 Pac. 523. In *Huntworth v. Tanner* we said, at page 684:

"The holdings of this court are strictly in accord with the idea that the right to peacefully pursue an avocation is more than a personal right."

In the case of *Yick Wo v. Hopkins*, 118 U. S. 356, the supreme court of the United States said:

"But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the com-

monwealth 'may be a government of laws and not of men.'
For, the very idea that one man may be compelled to hold his
life, or the means of living, or any material right essential
to the enjoyment of life, at the mere will of another, seems
to be intolerable in any country where freedom prevails, as
being the essence of slavery itself."

The idea upon which picketing by any means cannot be
sustained is that it intimidates the public from entering into
the place, and doing business with a person before whose
store or place of business a line of guards is stationed.   Where
a line of guards, consisting of one or more, is stationed in
front of a place of business, every one knows that such guard
is there for the purpose of intimidating and preventing the
public from dealing with the person whose place of business
is picketed.   That this is contrary to the spirit of our insti-
tutions, and the right to conduct a lawful business in a lawful
way, without molestation of other persons, needs no argument
to sustain it.   16 R. C. L., page 453.   The cases are numerous
to that effect.

In *Pierce v. Stablemen's Union, Local No. 8760,* 156 Cal.
70, 103 Pac. 324, the supreme court of California said:

"A picket, in its very nature, tends to accomplish, and is
designed to accomplish, these very things.   It tends to, and
is designed by physical intimidation to, deter other men from
seeking employment in the places vacated by the strikers.
It tends, and is designed, to drive business away from the
boycotted place, not by the legitimate methods of persuasion,
but by the illegitimate means of physical intimidation and
fear.   Crowds naturally collect; disturbances of the peace
are always imminent and of frequent occurrence.   Many
peaceful citizens, men and women, are always deterred by
physical trepidation from entering places of business so under
a boycott patrol.   It is idle to split hairs upon so plain a
proposition, and to say that the picket may consist of nothing
more than a single individual, peacefully endeavoring by
persuasion to prevent customers from entering the boycotted
place.   The plain facts are always at variance with such
refinements of reason."

In *Barnes & Co. v. Chicago Typographical Union No. 16*, 232 Ill. 424, 436, 83 N. E. 940, 14 L. R. A. (N. S.) 18, it was said:

"There have been a few cases where it was held that picketing, by a labor union, of a place of business is not necessarily unlawful if the pickets are peaceful and well behaved, but if the watching and besetting of the workmen is carried to such a length as to constitute an annoyance to them or their employer it becomes unlawful. But manifestly that is not a safe rule and furnishes no fixed or certain standard of what is lawful or unlawful. Any picket line must result in annoyance both to the employer and the workmen, no matter what is said or done, and to say that the court is to determine by the degree of annoyance whether it shall be stopped or not would furnish no guide, but leave the question to the individual notions or bias of the particular judge. To picket the complainants' premises was in itself an act of intimidation and an unwarrantable interference with their rights."

In the case of *Goldberg, Bowen & Co. v. Stablemen's Union*, 149 Cal. 429, 86 Pac. 806, 117 Am. St. 145, 8 L. R. A. (N. S.) 460, where it was averred in the complaint that pickets were stationed in front of plaintiff's place of business, with intent to threaten and intimidate customers of the plaintiff, and defendants threatened to, and did, keep there, representatives and pickets, bearing placards and transparencies, and by that means, intimidated customers from entering said place of business, it was said:

"It cannot be successfully contended that the said acts of defendants committed immediately in front of plaintiff's place of business as aforesaid, could not, in the nature of things, have had the effect of intimidating plaintiff's patrons, and as it is averred that they did have that effect, the fact of such intimidation must, for the purpose of this case, be considered as established. And such acts, having such effect, undoubtedly interfered with and violated plaintiff's constitutional right to acquire, possess, defend, and enjoy property."

In the case of *Union Pac. R. Co. v. Ruef*, 120 Fed. 102, it was said:

"This 'picketing' has been condemned by every court having the matter under consideration.   It is a pretense for 'persuasion,' but is intended for intimidation.   Gentlemen never seek to compel and force another to listen to the art of persuasion.   To stop another on the street, get in his road, follow him from one side of the street to another, pursue him wherever he goes, stand in front of his residence, is not persuasion. · Intimidation cannot be defined.   Neither can fraud be defined.   But every person knows whether his acts are fraudulent, and he knows whether his acts are intimidating."

In the case of *Beck v. Railway Teamsters' Protective Union,* 118 Mich. 497, 77 N. W. 13, 74 Am. St. 421, 42 L. R. A. 407, it was said:

"To picket complainants' premises in order to intercept their teamsters or persons going there to trade is unlawful. It itself is an act of intimidation, and an unwarrantable interference with the right of free trade.   The highways and public streets must be free to all for the purposes of trade, commerce, and labor.   The law protects the buyer, the seller, the merchant, the manufacturer, and the laborer in the·right to walk the streets unmolested.   It is no respecter of persons ; and it makes no difference, in effect, whether the picketing is done 10 or 1,000 feet away."

The authorities are numerous to the same effect.   By authority, therefore, as well as by reason, the opinion of this court in *Jensen v. Cooks' & Waiters' Union, supra,* is amply sustained.   That case is controlling of the facts in this case, and it was, therefore, the duty of the trial court to grant the injunction prayed for.

Appellants insist that they are entitled to damages.   The record shows, beyond dispute, that there was a large falling off in the appellants' business immediately after pickets were stationed in front of the premises, and while it is plain that the appellants are entitled to recover the damages they have suffered by reason of the unlawful picketing, we find nothing in the record upon which to base a judgment for any substantial amount.   We find nothing in the record showing

what the profits of the business were.   The average gross receipts for many months prior to the picketing complained of amounted to more than $4,000 per month.   Thereafter, the average receipts amounted to little more than $1,000 per month..  But, without a showing of the profits which the appellants made, a judgment for damages cannot be based upon average receipts..  We are of the opinion that, under the facts, the trial court should have granted nominal damages.

In the decree, the costs were awarded against certain of the respondents, but not against the unions, which were really the instigators and controlled the picketing, and caused the damage in the case.   It is argued by the respondents that costs cannot be awarded against the unions because the unions are not incorporated bodies, but are mere voluntary associations.   It is alleged in the complaint that these unions are voluntary organizations, that the membership thereof is in the neighborhood of five hundred, and is so large that it is impracticable to bring all the members thereof before the court, and the officers, therefore, only, are made parties, without bringing all of the members of the unions before the court.

In the case of *Branson v. Industrial Workers of the World*, 30 Nev. 270, 95 Pac. 354, it was held that, in an action in equity against a voluntary unincorporated organization where the members comprising the same were numerous, such organizations might be made parties to an action where a few of the members thereof were made defendants for the purpose of representing the organization; and in that case it was held proper to enter judgment against the organization, as well as against the individual parties who were named as defendants in the case.   That case is a learned discussion of the question, and, we think, is conclusive.

It became the duty of the court, therefore, to enter a judgment for damages and costs against all of the respondents.

The judgment appealed from is reversed, and the cause remanded, with instructions to the lower court to grant an injunction, as prayed for, against all of the respondents, and

against all other persons acting by, through, or under them, and for nominal damages, and for the costs in this court, as well as in the court below.

MAIN, WEBSTER, MORRIS, and PARKER, JJ., concur.

CHADWICK, J. (concurring)—I am not prepared to admit, as suggested in the dissenting opinion, that "the law and equities of this case have been settled by the great weight of authority," in favor of the respondents. There are some cases holding that picketing, so long as it does not partake of the character of an active intimidation by word or force of arms, is lawful, but the trend of all modern authority is to the contrary. For, from the very nature of things, a court cannot say to men nursing grievances that thus far thou shalt go with the law in thine own hands and no further. To so hold makes the law as weak as human nature is when acting under the passion of numbers, whereas it should be fixed in its principles without compromise as to degree when applied to a like state of facts. No court can lay down a rule fixing a boundary where the right ends and wrong begins, when the facts are not in being and acts are prospective and within the keeping of men who are acting upon their own judgment of the limit of their authority, albeit they are nominally moving under an order of the court.

The *Jensen* case settles this controversy; but, if it were not so, there is sufficient authority to be found in *Jones v. Leslie*, 61 Wash. 107, 112 Pac. 81, Ann. Cas. 1912B 1158, 48 L. R. A. (N. S.) 893. In that case we have the same case presented from the side of the employee. We held that an employer who had discharged a workman could not blacklist his employee. When an employer assumes to take the law in his own hands and to say to the employing world that the one whom he has discharged has offended in some way against him and for that reason alone should not be employed by others, his act is declared to be violative of the "sense of right and justice." The court, speaking through Judge Dunbar, whose

broad conception of the rights of men was never questioned, said:

"This presents a case here which is purely a question of law. It would be well to remember, in the beginning, that it is fundamental that a man has a right to be protected in his property. This was the doctrine of the common law; is, and always has been, the law in every civilized nation. It is, of necessity, one of the fundamental principles of government, the protection of property being largely one of the objects of government. For the protection of life, liberty, and property, men have yielded up their natural rights and established governments. Is, then, the right of employment in a laboring man property? That it is, we think cannot be questioned. The property of the capitalist is his gold and silver, his bonds, credit, etc., for in these he deals and makes his living. For the same reason, the property of the merchant is his goods. And every man's trade or profession is his property, because it is his means of livelihood; because, through its agency, he maintains himself and family, and is enabled to add his share towards the expenses of maintaining the government. Can it be said, with any degree of sense or justice, that the property which a man has in his labor, which is the foundation of all property and which is the only capital of so large a majority of the citizens of our country, is not property; or, at least, not that character of property which can demand the boon of protection from the government? We think not. To destroy this property, or to prevent one from contracting it or exchanging it for the necessities of life, is not only an invasion of a private right, but is an injury to the public, for it tends to produce pauperism and crime. This relief has been granted to employers in many forms. Workmen have been enjoined from collecting about the employer's place of business for the purpose of ridiculing his employees with a view of causing them to stop work; and many other demonstrations of the same character and purpose have been enjoined, of course, on the theory that it was an unlawful act. To deny the same relief to the employee under similar circumstances would be a reproach to the law. . . .

"It is an excellent rule of action to refrain from interference with the affairs of others, and especially if the motive actuating such interference is to work injury to others."

That statement of the law is enough to close this controversy.

Picketing is notice to the world that organized labor has blacklisted an employer.

If it be wrong for the employer to take from the one who labors his capital, which is his right to offer his services in the market for labor, it is equally as wrong for the laborer acting either individually or collectively, whether by peaceful or violent methods (for experience teaches us that either way invites breaches of the peace), to take from the employer the right to pursue his business unrestrained, so long as he does not violate the law of the land. The gist of the case does not lie in the *manner* in which either side proceeds to redress its wrongs, but the test is to be found in answer to the question, whether, under any set of circumstances, a court of equity should affirm the *ex parte* judgment of a person or body of men acting extra-judicially, and put in his hand, or their hands, whether employer or employee, a roving commission to go out and redress a wrong, either real or fancied, in their own way.

Barring a few of the cases referred to in the minority opinion, I know of no instances in the history of jurisprudence where it has ever been contended that a man, whoever and whatever he may be, could be harassed at the will of another whose sole right to interfere with the lawful conduct of that other rested in a difference of opinion upon a question which the law had not assumed to settle or define.

Take the case at bar. Appellants were observing the laws of the land, and of the unions. They employed union labor and paid union wages. Because they refused to discharge a cook who had been vouched for by the union, but who was delinquent in his dues to it, they are condemned as unfair, they are blacklisted, their place is picketed, their peace is molested, and their business seriously interrupted and impaired. To do these things, is the purpose of the respondents, thus coercing obedience to their demands, upon penalty of

ruin. This can be as effectually done by the so called "peaceful" method as by violence. In the *Jones* case, the employer did no more than to peacefully "notify" and "threaten" to withdraw patronage.

Appellants' offense seems to be that they have refused to make of themselves agents for the collection of dues. The right of the union to compel one of its own members to pay dues may be admitted, but it does not follow that it can compel another to become a party, either directly or indirectly, to its internal controversies, or condemn him by star chamber methods, or by judgments rendered in its secret councils.

Upon such methods, the law, which is no more than the expression of that fairness which should exist between man and man, ought to frown. We have condemned trial and condemnation by the employer; by the same rule we are bound to condemn trial and condemnation by the employee.

The *Jones* case is a complete answer to the argument put forth in the minority opinion, and emphasizes the fact that neither the employer nor the laborer can take the law in his own hands; that, if the one comes to this court seeking to restrain the other, he must in turn submit to the same rule when his adversary comes asking for the injunctive processes of the court.

This is but another way of saying that legal principles apply without reference to the calling or occupation of men. In more homely but more expressive phrase, "It is a poor rule that won't work both ways."

"To deny the same relief to the employee [employer] under similar circumstances would be a reproach to the law." *Jones v. Leslie, supra.*

ELLIS, C. J. (concurring)—The authorities generally on the question here presented are hopelessly divided. But the question is no longer an open one in this state. There is no material difference between the facts established by the proofs here and those admitted by the demurrer in the case of *Jensen v. Cooks' & Waiters' Union,* 39 Wash. 531, 81 Pac. 1069, 4

L. R. A. (N. S.) 302. As I read it, this decision is in perfect accord with that in the *Jensen* case. To me it seems that the two cases cannot be soundly distinguished either in law or in fact. So long as that decision stands, it is binding on this court. I am therefore constrained to concur with the majority.

FULLERTON, J. (concurring) — I concur for the reason stated by Chief Justice Ellis.

HOLCOMB, J. (dissenting)—The good faith of the strike in this controversy is not in question.

An examination of the decree set forth in the majority opinion shows that all malevolent, intimidating, and coercive acts were enjoined. Under the terms of the decree there could be no congregating about and no intimidation, coercion, or annoyance of either employees or prospective employees or patrons of the places of business.

This case was tried on facts, and the facts and the law support the decree entered. Notwithstanding what was said in *Jensen v. Cooks' & Waiters' Union*, 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N. S.) 302, where was sustained a complaint which, among other things, alleged congregating about the business entrance, and illegal, coercive and intimidative acts, and injuries and damages resulting therefrom, and although the court in passing upon the allegations of the complaint made the observations quoted in the majority opinion, those observations were not entirely pertinent to the question there involved, were not necessary, and part of them are manifestly mere *obiter*.

The law and the equities of this case seem to me to be settled by the very great weight of authority contrary to the decision of the majority.

One of the leading cases on this question and one which has been often cited by other courts is that of *Karges Furniture Co. v. Amalgamated Woodworkers Local Union No. 131*, 165 Ind. 421, 75 N. E. 877, 2 L. R. A. (N. S.) 788. In that case, as a threshold proposition, it was held that a trade union

consisting of an unincorporated association of artisans cannot be sued in its company name in the absence of statute authorizing it, but must be sued in the name of all the individual members thereof. In this state we have no statute authorizing voluntary associations either to sue or to be sued, and hence these unions were not proper parties to this suit and could not be held liable either generally or for the costs.

The principal proposition determined in that case was, as stated in the syllabus:

"Members of a trade union consisting of employees under no contractual restraint may lawfully combine and by prearrangement quit their employment in a body, to secure from their employers an advance in wages, shorter hours, or any other legitimate benefit, though they know at the time that such action will be attended with injury to their employers' business, provided the strike is carried on in a lawful manner and free from force, intimidation, and false representation.

"A trade union during a strike may appoint pickets or a committee to visit the vicinity of factories to take note of the persons employed, and secure by lawful means their names and places of residence, for the purpose of peaceful visitation and solicitation by means other than threats, intimidation, etc."

In the course of the decision in that case, these observations were made:

"A tradesman, singly or in combination with others, may lawfully advertise his goods, undersell, solicit, and win the customers of his rival, knowing that he is thereby ruining the latter's business. This is competition, and is what the law commends as 'the life of trade.' In such case one loses his property by the acts of his neighbor, but it is *damnum absque injuria*. But the contest must be a fair and honest one. If the same tradesman, singly or with others, advertises his goods, undersells, solicits, and wins away the customers of his rival by false representations, intimidation or artifice, not to better himself, but to injure his rival, he has committed an actionable wrong. [Authorities.] . . . Whatever one man may do, all men may do, and what all may do singly they may do in concert, if the sole purpose of the combination is to advance the proper interests of the members, and it is con-

ducted in a lawful manner. [Authorities.] . . . It is argued that the maintenance of pickets at the plaintiff's factory was an unlawful interference with its business, and that the appointment of, instruction to, and the receiving of daily reports from such pickets constituted all participating members of the union civil conspirators. Whether picketing is lawful or unlawful, depends in each particular case upon the conduct of the pickets themselves. . . . Under no circumstances have pickets the right to employ force, menaces, or intimidation of any kind in their efforts to induce nonstriking workmen to quit, or to prevent those about to take the strikers' places to refrain from doing so; neither have they the right, as pickets or otherwise, to assemble about the working place in such numbers or in such manner as to impress workmen employed, or contemplating employment, with fear and intimidation. [Authorities.] . . . The law, having granted workmen the right to strike to secure better conditions from their employers, grants them also the use of those means and agencies, not inconsistent with the rights of others, that are necessary to make the strike effective. This embraces the right to support their contest by argument, persuasion, and such favors and accommodations as they have within their control. The law will not deprive endeavor and energy of their just reward, when exercised for a legitimate purpose and in a legitimate manner. [Authorities.] . . . The decided cases are not in harmony with respect to the right to persuade, but the clear weight of authority is to the effect that so long as a moving party does not exceed his absolute legal rights, and so does not invade the absolute rights of another, he may do as he pleases, and may persuade others to do like him [Authorities.]"

In *Iron Moulders' Union v. Allis-Chalmers Co.*, 166 Fed. 45, 20 L. R. A. (N. S.) 315, decided by the circuit court of appeals of the seventh circuit, Grosscup, Baker, and Seaman, Judges, portions of a decree entered by the district judge below enjoining the members of the union from in any manner directly interfering with, hindering, obstructing, or stopping the business of complainant or its agents, servants, or employees in the maintenance, conduct, management or operation of its business, and enjoining them from using per-

suasion and from enforcing, maintaining, or aiding in illegal boycott against the company, its agents, or employees, and from endeavoring to illegally induce people not to deal with the company, its agents and employees, were among other things in the decree vacated; and a provision of the decree enjoining the strikers from congregating upon or about the company's premises or the sidewalk, streets, alleys, or approaches adjoining or adjacent to or leading to the premises, and from picketing the complainant's place of business, etc., was modified by the circuit court of appeals so as to provide only for injunction against such *congregating* in such places and picketing *in a threatening or intimidating manner*. The court quoted with approval the *Karges Furniture Co.* case above cited, and a great number of other cases by both state and Federal courts, and in the course of the decision observed:

"But attempts to injure each other by *coercing* members of society who are not directly concerned in the pending controversy to make raids in the rear cannot be tolerated by organized society, for the direct, the primary, attack is upon society itself. And for the enforcement of these mutual rights and restraints organized society offers to both parties, equally, all the instrumentalities of law and of equity. With respect to picketing as well as persuasion, we think the decree went beyond the line."

The above case was followed but very recently in *Tri-City Cent. Trades Council v. American Steel Foundaries*, in the circuit court of appeals, seventh circuit, decided December 6, 1916, 238 Fed. 728. In the course of this decision these arguments were made:

"The right to strike to secure higher wages and improved conditions of labor is too firmly established to necessitate further elucidation. From the record here we can reach no other conclusion than that the object of this strike was to secure for plaintiff's employees the November wage scale of the union. Nothing appears in the record to indicate that this was not in good faith, or to raise the suspicion that the strike was a mere cloak to cover a deliberate purpose to interfere

with the plaintiff's conduct of its business, or to injure and destroy its business and property.   The purpose being lawful . . . picketing may be employed, as this court has held, . . .;"

citing and quoting the *Allis-Chalmers* case.   It was concluded that:

"In so far as the decree restrains all picketing and all persuasion and all interference with the plaintiff's free and unrestrained control of its plant and the operation of its business, it transcends the limit of proper restraint, and should be modified, so as to eliminate therefrom any restraint of defendants from doing unlawful acts as indicated herein."

It was ordered that the decree be modified to conform to the decree in the *Allis-Chalmers* case.

The opinion in the above case cited the following cases and authorities in support of these views:   *Allis-Chalmers* case, *supra; Karges Furniture Company* case, *supra;* 7 Labatt, Master & Servant, p. 8364; *Everett-Waddey Co. v. Richmond Typographical Union No. 90,* 105 Va. 188, 53 S. E. 273, 5 L. R. A. (N. S.) 792; *In re Heffron,* 179 Mo. App. 639, 162 S. W. 652; *Jones v. Maher,* 62 Misc. Rep. 388, 116 N. Y. Supp. 180; *Jones v. Van Winkle Gin & Machine Works,* 131 Ga. 336, 62 S. E. 236; 127 Am. St. 235, 17 L. R. A. (N. S.) 848; *Pope Motor Car Co. v. Keegan,* 150 Fed. 148. See, also, *Foster v. Retail Clerks' International Protective Ass'n,* 39 Misc. Rep. 48, 78 N. Y. Supp. 860; *Butterick Pub. Co. v. Typographical Union,* 50 Misc. Rep. 1, 100 N. Y. Supp. 292; *Searle Mfg. Co. v. Terry,* 56 Misc. Rep. 265, 106 N. Y. Supp. 438; *Gray v. Building Trades Council,* 91 Minn. 171, 97 N. W. 663, 103 Am. St. 477, 63 L. R. A. 753; *Minnesota Stove Co. v. Cavanaugh,* 131 Minn. 458, 155 N. W. 638; *Beaton v. Tarrant,* 102 Ill. App. 124; *Parkinson Co. v. Building Trades Council of Santa Clara County,* 154 Cal. 581, 98 Pac. 1027, 21 L. R. A. (N. S.) 550; *Lindsay & Co. v. Montana Federation of Labor,* 37 Mont. 264, 96 Pac. 127, 127 Am. St. 722, 18 L. R. A. (N. S.) 707.   All

these decisions are by courts of very high repute and authority.

Upon the reasoning of the foregoing authorities, I am impelled to dissent from the majority opinion, and to hold that the decree of the lower court should in all respects be affirmed.